**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------x
                                                      :
UNITED STATES OF AMERICA                              :
                                                      :
              v.                                      :
                                                      :          Case No. 21-cr-00174 (DG)
HANAN OFER,                                           :
                                                      :
              Defendant.                              :
                                                      :
------------------------------------------------------x


## DEFENDANT HANAN OFER'S SENTENCING MEMORANDUM


Arthur D. Middlemiss
Lewis Baach Kaufmann Middlemiss, pllc
405 Lexington Avenue
64th Floor
New York, New York 10174
(212) 822-0128
*Counsel for Hanan Ofer*


Dated:  May 5, 2023

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   THE UNDERLYING CHARGES AND PLEA NEGOTIATIONS ...................... 2

    A.   The Original Indictment and its Underlying Circumstances ........................ 6

    B.   What Led to the Criminal Conduct .............................................................. 8

III.  THE PERSONAL HISTORY AND CHARACTER OF HANAN OFER ........... 10

    A.   Mr. Ofer's Personal History Leading up to the Criminal Conduct ............ 10

    B.   Letters of Support ...................................................................................... 13

IV.   THE CHARGED CONDUCT AND APPLICABLE GUIDELINES .................. 15

V.    A NON-INCARCERATORY SENTENCE IS WARRANTED .......................... 16

    A.   The Personal History and Characteristics of the Defendant ...................... 16

    B.   The Nature and Circumstances of the Offense ........................................... 17

    C.   Protection of the Public ............................................................................. 17

    D.   Seriousness of the Offense and Deterrence ............................................... 18

    E.   The Need to Avoid Unwarranted Sentencing Disparities .......................... 19

    F.   The Court Should Consider Alternatives to Incarceration ......................... 19

    G.   Fine ........................................................................................................... 20

VI.   CONCLUSION .................................................................................................. 21

## I.     INTRODUCTION

Hanan Ofer will be 70 years old in August 2023. He was born and raised in Israel and served with the Israeli Defense Forces for several years, including during the "Yom Kippur War" in 1973. He fell in love with New York while employed by the Israeli Government as a Sky Air Marshal for El Al Airlines after he left the military. Thereafter, he emigrated to New York and attended the New York Institute of Technology while working as a special ground security agent for El Al Airline during the day. After graduating from the New York Institute of Technology in 1982, Mr. Ofer began a banking career with Republic National Bank in New York. Mr. Ofer's banking career at Republic National Bank and its successor entity, HSBC Bank ("HSBC"), was in "logistics," which refers here to the transportation/delivery, storage, packaging, cargo handling, distribution processing, and information processing of hard currency on behalf of the banks where he worked. In 1995, Mr. Ofer became a U.S. citizen.

Mr. Ofer raised, and is devoted to, two sons, now adults. In 2020, he married Mi Hwa Mun, after a four-year relationship. Mr. Ofer is dedicated to his family, including his surviving sister, Aldama, and her family in Israel. Other than the acts that bring him before the Court, he has never been charged with any crime. Most significantly, the Government agrees that Mr. Ofer was a minor participant in the crime to which he pled guilty. He has accepted responsibility for his actions relating to the events underlying his prosecution and that bring him before this Court, and he recognizes the seriousness of this issue.

This submission will show that Mr. Ofer's criminal conduct stands as an outlier from a life otherwise lived as a productive member of society devoted to family and community. It seeks not to excuse or justify Mr. Ofer's conduct, but to explain and put his actions in context and provide

the Court with the background required to understand how he found himself in these circumstances.[1]

## II.  THE UNDERLYING CHARGES AND PLEA NEGOTIATIONS

Mr. Ofer was allowed to plead guilty to a one-count information charging him with a single count of 31 U.S.C. §5318(h), failure to implement a sufficient anti-money laundering ("AML") program, a crime that was not contained in the original indictment.

Mr. Ofer and his co-defendant in the originally filed indictment were alleged to have executed a "scheme" that involved the use of their "expertise" to convince a credit union, the New York State Employees Federal Credit Union ("NYSEFCU"), to take on high-risk banking products – bulk cash and international check processing – and resulted in the credit union taking on the business without implementing adequate AML compliance controls.[2] Neither banking product was illegal, but both presented high AML risk and thus required the defendants' companies, NYSEFCU-CUSO and DDH Group (which introduced the business to the credit union), and the credit union, NYSEFCU, to implement robust AML controls. The "scheme" alleged in the original indictment involved telling the credit union that the risk would be mitigated through the implementation of appropriate AML controls and then failing to provide them.

---

[1] Given the submission schedule, the defense has not reviewed the final Pre-Sentence Report ("PSR"). The defense reserves the right to object and supplement this submission if the PSR sentencing guidelines calculation differs from that adopted by the Government and Mr. Ofer in the plea agreement. The Plea Agreement contemplated that a guideline range of 0-6 was appropriate. We note that both Mr. Ofer and the Government have made detailed written submissions to the Probation Department  in support of that conclusion.

[2] According to the Federal Financial Institutions Examination Council ("FFIEC") *Bank Secrecy Act (BSA) /Anti-Money Laundering (AML) Examination Manual*, bulk shipments of currency entail the transportation of large volumes of U.S. or foreign bank notes. The banking product presents money laundering risk because "[b]ulk shipments of currency to banks from shippers that are presumed to be reputable may nevertheless originate from illicit activity," but "[t]he activity of shipping currency in bulk is not necessarily indicative of criminal or terrorist activity … [because] [m]any individuals and businesses, both domestic and foreign, generate currency from legitimate cash sales of commodities or other products or services or certain industries such as tourism or commerce sometimes referred to as wholesale." https://bsaaml.ffiec.gov/manual/RisksAssociatedWithMoneyLaunderingAndTerroristFinancing/03.

The original indictment signaled the Government's view of Mr. Ofer's limited culpability, i.e., that he was a minor participant in its alleged "scheme." It charged Mr. Ofer with only one count in an eight-count indictment, a violation of 18 U.S.C. §1960, a technical offense involving Mr. Ofer's alleged failure to register or license one of the introducing companies, DDH Group, as a money services business. The original indictment charged Mr. Ofer with no crimes at all related to NYSEFCU-CUSO. Put simply, the original indictment did not charge Mr. Ofer with any crimes related to the operation of NYSEFCU-CUSO, even as a minor participant.

After indictment, the Government and the defense engaged in lengthy plea discussions, including extensive discussions of the facts and relevant evidence, in reaching Mr. Ofer's plea agreement. Those plea discussions included the defense providing the Government information regarding Mr. Ofer's role. As a result of these post-indictment plea negotiations, the Government permitted Mr. Ofer to plead guilty to a single count of 31 U.S.C. §5318(h) with respect to the operation of NYSEFCU-CUSO, failure to implement a sufficient AML program, a crime that was not contained in the original indictment. The crime to which Mr. Ofer pled guilty carries a substantially lower sentencing guidelines range than the single count with which he was charged in the original indictment. The Government further concluded that Mr. Ofer was a minor participant in the "5318(h)" crime under USSG §3B1.2(b), which provides a 2-level reduction in offense level, and the 2-level reduction in offense level is reflected in the plea agreement.

This was a correct result. Mr. Ofer was, in fact, a minor participant in the "scheme." His role in the business, as it had been in his previous banking jobs, was to supervise the logistics required to move bulk cash from one location to another. His role was not to provide AML compliance services, and he did not purport to have AML expertise that would help NYSEFCU mitigate the AML risk associated with the bulk cash banking product. As reflected in his plea

3

allocution (*see* below), Mr. Ofer pled guilty because he was a minority owner in NYSEFCU-CUSO and thus bore, and took, responsibility for its failure to implement adequate AML controls, but he was a minor participant in the crime because his role was not to implement those AML controls and he did not present himself to NYSEFCU as an AML expert. Without presuming to speak for it, we respectfully submit that the Government accepted this factual analysis when it deemed Mr. Ofer to be a minor participant.

A plain reading of the original indictment reveals that the heart of the alleged "scheme" was offering the credit union high-risk products without providing promised AML compliance. But as the original indictment reflects, it was Mr. Ofer's co-defendant, not Mr. Ofer, who was responsible for the operation of the AML program. Mr. Ofer, unlike his co-defendant, was neither a "Certified Anti-money Laundering Specialist with ACAMs," a "Certified Compliance and Regulatory Specialist," nor a "Certified Crime Specialist with the Association of Certified Financial Crime Specialists." By contrast, Mr. Ofer has never been certified as a money laundering expert or a compliance specialist by any organization. Further, the indictment alleged that it was Mr. Ofer's co-defendant who was responsible for creating and implementing the AML program for NYESFCU-CUSO. This corroborates Mr. Ofer's logistics-focused role and establishes his minor participation in the alleged "scheme." Distilled, Mr. Ofer was not involved directly in the AML compliance function at the indictment's heart, which we note is an accusatory instrument to which Mr. Ofer did not plead guilty.

Mr. Ofer's sworn plea allocution – which the Court and the Government accepted as sufficient – further confirms his non-AML-centric role. Again, the primary "harm" was not the offer to do legal, albeit high-risk business, it was the promise to do high-risk business that would be controlled by adequate AML controls when those AML controls were not provided. Mr. Ofer

accepted responsibility as a minority owner of NYSEFCU-CUSO that it was his role "to make sure that the individual responsible for developing and maintaining the AML program actually did what they were supposed to do to make the program effective" (Plea Proceeding at 24-25). Mr. Ofer's entire factual allocution is provided below:

> From November 2014 to June 2016 I was part owner of New York State Employees Federal Credit Union CUSO LLC. The company was required to maintain and effective anti-money laundering program and it did not. I took part in the operation of the company. I knew the company had to have an effective AML program and that the failure to maintain such a program is a crime.
>
> I knew that I should have but did not take sufficient steps to make sure that the individual responsible for developing and maintaining the AML program actually did what they were supposed to do to make the program effective. I accept responsibility and deeply regret my actions.

(Plea Proceeding: 24-25).

Again, the Government permitted Mr. Ofer to plead guilty to a single-count information charging an AML program violation in connection with NYSEFCU-CUSO, a crime that the defense, and we submit the Government, anticipated would result in a far lower sentencing guideline level than the originally charged §1960 crime. The Government further agreed that Mr. Ofer was a minor participant in the newly charged crime, and thus that a 2-level reduction in offense level per USSG §3B1.2(b) was applicable. The negotiation's results are reflected in the terms of the plea agreement.

Mr. Ofer made what he believed was a reasonable decision to rely on others (including other owners) to design and implement the AML program, and he regrets that decision. He accepts responsibility for his failure as a part owner to make sure that adequate AML controls were imposed. Per the plea agreement, the Government and the defense agree that the applicable adjusted offense level is "6," and that the applicable sentence guidelines range is a sentence of

from 0 to 6 months in jail. For the reasons stated here and below, we urge the Court to conclude, as we do, that a non-incarceratory sentence is the only sentence that will serve the ends of justice.

### A.  The Original Indictment and its Underlying Circumstances

Mr. Ofer was one of approximately 30,000 HSBC employees laid off in 2010. Gyandre Asre, the co-defendant in the originally filed indictment, was Mr. Ofer's direct manager at HSBC and was also subject to the 2010 layoffs. At HSBC, from 2001 to 2010, Mr. Ofer handled logistics for the bulk cash business under the supervision of Mr. Asre, who was the bulk cash manager for the Americas. In other words, Mr. Ofer dealt with the physical movement of bulk cash from one location to another. This involved the physical pick-up and delivery of the bulk cash shipments and the physical security of those shipments. Mr. Ofer was not directly involved in business generation, i.e., finding new clients for the bank, and was not tasked directly with AML compliance issues. He maintained an operations-focused role that required him to complete basic AML training every year. Mr. Ofer understood that Mr. Asre was mainly involved with the client side of the business. When HSBC sold its bulk cash business to another bank in 2010, both Mr. Ofer and Mr. Asre were on its close-out team.

In 2011, Mr. Ofer and Mr. Asre joined a consulting firm with a New York-based multinational corporation to advise a bank client of the firm's wholly owned subsidiary, an armored car company which handled bulk cash. Mr. Ofer advised the bank on logistics and Mr. Asre introduced the bank to new clients and advised on the commercial aspects of the business. In 2014, the principals of the armored car company were introduced to NYSEFCU management by an experienced credit union professional. It was originally planned that this person would be the president of the NYSEFCU-CUSO, but NYSEFCU did not accept him in that role. Ultimately, the

6

chairman of the armored car company signed a letter of intent[3] with NYSEFCU's Chairman to create a new entity, NYSEFCU-CUSO. After the letter of intent agreement was executed, Mr. Ofer was asked to join NYSEFCU-CUSO as a 25% owner by the Chairman and the CEO of armored car company who later became the Chairman and CEO of the NYSEFCU-CUSO. The armored car company's holding company owned 50% of NYSEFCU-CUSO, and Mr. Asre owned the remaining 25%. NYSEFCU-CUSO's Chairman and CEO made most of the business decisions for the business and maintained relationships with NYSEFCU's management. No one other than Mr. Ofer and Mr. Asre were charged in the indictment.

Mr. Ofer was brought into the business because of his long-term experience in the physical logistics and security of bulk cash shipments. Logistics, i.e., the arrangements required for the physical movement of bulk cash, remained his focus during the approximately two years that NYSEFCU-CUSO operated.[4] Mr. Ofer was not assigned to the supervision, operation, or management of the NYSEFCU-CUSO AML compliance program. When NYSEFCU-CUSO began operations, the Chairman and CEO of NYSEFCU was an individual who it is believed (and Mr. Ofer then believed) was a lawyer and who had served as a long-time bank examiner for the New York State Banking Department and was a former insurance regulator with the New York State Department of Insurance's Frauds Bureau. The head of compliance for NYSEFCU was then-

---

[3] The original signed letter of intent included 80/20 ownership-sharing between the armored car company and NYSEFCU armored car company agreed to provide all necessary compliance to facilitate the business and introduce NYSEFCU to its extensive corporate client base. The document can be provided to the Court upon request.

[4] The term "CUSO" is an abbreviation for credit union service organization, which is an entity that can provide a variety of financial and operational services to a credit union, including check cashing and coin and currency services. It was understood that the purpose of NYSEFCU-CUSO was to facilitate an agreement between the armored car company's holding company and a Mexican bank to help NYSEFCU handle bulk transfers of currency. Later in 2015, NYSEFCU-CUSO entered a contract to provide bulk cash services for a U.S. money transmitter which was one of the armored car company's major clients. The Mexican bank and U.S. money transmitter were NYSEFCU-CUSO's only two customers. It should be noted that the money transmitter, as outlined in the indictment, involved $790 million in transactions that were not facilitated by the NYSEFCU-CUSO or DDH Group – rather the money transmitter became a direct customer of NYSEFCU. Mr. Ofer had no role in these transactions and received no compensation related to them.

understood by Mr. Ofer to have been in the banking industry for over 35 years, having been a director of the American Broadcast Employees Federal Credit Union and CEO of Saks Fifth Avenue Enterprises Federal Credit Union. Mr. Ofer did not perceive these persons to be unsophisticated and Mr. Ofer believed they fully understood the risks.

In 2015, a second company, DDH Group, was formed, and Mr. Ofer was a 50% owner. DDH Group provided remote capture technology to a Mexican bank, referred to as "Mexican Bank 2" in the indictment, to facilitate the clearing of U.S. dollar checks for U.S. banks' account holders only, which were deposited with the Mexican bank. Mr. Ofer was not directly involved in either acquiring this bank as a client or managing the day-to-day operations of DDH Group.

### B.  What Led to the Criminal Conduct

NYSEFCU-CUSO was required to, but did not, establish an effective AML program that included, at a minimum, 1) the development of internal policies, procedures, and controls; 2) the designation of a compliance officer; 3) an on-going training program; and 4) an independent audit function to test programs. 31 U.S.C. §5318(h). Mr. Ofer's failure, as a minority owner of NYSECFCU-CUSO, to cause NYSEFCU-CUSO to implement an effective AML program constituted a crime and exposed NYSEFCU to risk. The crime is serious, and exposed NYSEFCU to AML risk, but Mr. Ofer was a minor participant in the crime. The applicable sentencing guideline range reflected in the plea agreement does not require a jail sentence, and we submit respectfully that an incarceratory sentence is not warranted.

In this regard, it is relevant to consider that Mr. Ofer's focus was on logistics, not AML compliance, and that his failure was in not taking full steps to ensure that the business had an effective AML program. He relied, mistakenly, on others to provide requisite AML controls. Likewise, it is appropriate for this Court to consider that this case is about AML risk, not about

money laundering itself. The indictment alleges that NYSEFCU provided services to institutions that handled a large quantity of funds, including funds from Mexico, which is recognized to be a high-risk jurisdiction, but it is nowhere alleged that Mr. Ofer laundered money or knew that his services were used to launder money for others. Similarly, Mr. Ofer was not required to plead guilty to operation of an unlicensed money transmitting business in connection with DDH Group, in violation of 18 U.S.C. §1960, the only crime with which he was charged in the indictment, and a crime that would result in a far higher sentencing guidelines range.

It is also relevant to note that, despite his minority ownership, he did not receive significant proceeds from NYSEFCU-CUSO. In fact, Mr. Ofer's compensation during the entire time that NYSEFCU-CUSO operated was about $261,000. Mr. Ofer is not, and his conduct simply does not reflect, a hard-nosed, high-flying international criminal willing to move high-risk money in return for huge rewards.

The applicable Guidelines range, which we urge the Court to adopt, does not require this Court to impose a sentence of incarceration. A non-incarceratory sentence is within the applicable range, and the Court need not downwardly depart from the applicable range to impose a non-incarceratory sentence.

A non-incarceratory sentence is warranted because (1) Mr. Ofer's role in the less serious offense to which he pleaded guilty was minimal; (2) his error in judgment which resulted in the criminal conduct was an outlier in an otherwise law-abiding life; (3) a non-incarceratory sentence will not lessen a respect for the law, provides just punishment for the offense, and will serve as a deterrent to others in similar circumstances; and (4) a non-incarceratory sentence is in line with sentences imposed on other similarly situated defendants charged with comparable and even more serious crimes (such as violations of 18 U.S.C. § 1960 – operation of an unlicensed money

transmitter business). For all of these reasons, and under the facts and circumstances of this case, any incarceratory sentence would be a disproportionately harsh and unjust punishment.

### III.    THE PERSONAL HISTORY AND CHARACTER OF HANAN OFER

#### A.  Mr. Ofer's Personal History Leading up to the Criminal Conduct

As the PSR reflects, Mr. Ofer does not have a criminal history, and has led a law-abiding life prior to the events that lead him here.

Mr. Ofer was born in Israel on August 16, 1953, and raised in a Kibbutz near the border with Syria. He was the youngest of four children and was raised with two sisters and a brother. His father was a music teacher and conductor; his mother was a nurse. Mr. Ofer has two sons, the first born in 1994 and the second in 1995. His sons attended a Jewish elementary school in the Upper West Side and Mr. Ofer was an assistant coach for its softball and basketball teams. The family regularly attended synagogue services. His oldest son is married, and his youngest son will be married in August 2023. Mr. Ofer is close with both sons. He is married to Mi Hwa Mun but remains close to his ex-wife Anat Ofer. Since Mr. Ofer retired in 2016, he has maintained a modest lifestyle with his wife.

In 1971, Mr. Ofer volunteered for and was accepted into an elite naval unit in the Israeli Defense Forces ("IDF"), an analogue to the U.S. Navy Seals. He remained in the Israeli military until 1975 – a period well beyond the standard service time. He faced intense combat in the intervening period of hostilities, including during the Yom Kippur War, during which he took part in two raids across enemy lines.

According to publicly available information, applicants to the unit where Mr. Ofer served were required to commit to serve for four and one-half years, eighteen months more than the commitment required for other IDF units. The unit's training itself lasted 20 months, and the training course is considered to be one of the toughest training courses in the IDF. Candidates

10

underwent extensive medical tests, after which they were put through a series of physically and mentally grueling exercises for four days, during which doctors and psychologists were at hand to prevent burnout and physical injury. This training phase stressed psychological toughness, and tested recruits on their ability to operate under stress and fear. It is a process that few complete.

The missions in which Mr. Ofer participated included Operation Spring of Youth in 1973, in which Israeli special forces entered Beirut, acting in response to the Munich massacre of Israeli athletes in the 1972 Summer Olympics. The Israeli troops, including Mr. Ofer, arrived at the Lebanese beaches on speedboats launched from missile boats offshore. Mossad agents awaited the forces on the beaches with cars rented the previous day, and then drove them to their targets and later back to the beaches for extraction. The operation was featured in the 2005 Steven Spielberg film *Munich*. During the Yom Kippur War, Mr. Ofer's unit infiltrated Egyptian ports multiple times. The operations were extremely dangerous. Not only did operation participants risk being killed during combat, but capture also meant likely torture and/or execution. It is estimated that Egyptian forces killed 200 Israeli soldiers after they had surrendered.

Mr. Ofer was reluctant to discuss his participation in these operations. Despite his reluctance, we strongly believe, and respectfully submit, that his service is important to the Court's consideration of Mr. Ofer's history and characteristics in determining an appropriate punishment in this matter. Mr. Ofer's service and commitment strongly supports the conclusion that a sentence of imprisonment is not appropriate or necessary to serve the ends of justice under the particular circumstances of this case.

Following his military service, the Israeli Government recruited Mr. Ofer to serve as a Sky Air Marshal for El-Al Airlines, which was then owned by the Israeli Government. His job was to protect passengers on international flights against hijacking efforts. Mr. Ofer is highly trained in

counterterrorism, as well as in defending against hostile acts. Mr. Ofer is also knowledgeable in aviation security and international regulations pertaining to the airline industry. The international flights frequently brought him to New York, and he grew to love the culture and energy of New York City. In 1977, while still working for Israeli Government as a Sky Air Marshal, he attended Tel Aviv University.

The next year, he was hired as a special ground security agent for El-Al Airline in New York by the Israeli Government, and attended an evening program at the New York Institute of Technology, majoring in business administration. Due to Mr. Ofer's employment at El-Al Airline, and because of a collaboration between the Israeli Consulate and El-Al Airline, special measures were taken for Mr. Ofer's gun carry license. He longer maintains a gun carry license.

In 1980, two years later, Mr. Ofer suffered a devastating loss when his older brother, Major Chagai Ofer, an Israeli air force pilot, died in a plane crash during a military mission. The death of Mr. Ofer's brother resulted in Mr. Ofer building a strong bond with his then-four-year-old niece and eight-year-old nephew. He was especially close with Maayan, Chagai's youngest daughter, who could not remember her father. Mr. Ofer filled the void left by her father's absence during her childhood and throughout her life. Maayan, among others, has submitted a letter about Mr. Ofer, which is included in this submission to the Court.

When Mr. Ofer graduated from the New York Institute of Technology in 1982, he was accepted into a training program at Republic National Bank in New York. That started a nearly three-decade banking career that focused on managing the logistics of physical shipments of bulk cash. After six months of training, he was assigned to manage the foreign currency vault operations of the bank. Mr. Ofer's experience and knowledge in security and international airport procedures, and his trustworthy record as an air marshal and special ground security agent, were all taken into

consideration when evaluating him for the logistics position. The bank later offered to sponsor Mr. Ofer for a green card.

During 1986, Mr. Ofer was promoted to logistics manager of the bank, a position of trust that made him responsible for handling large amounts of cash on behalf of the bank. The position required Mr. Ofer to handle and manage the international movements of the bank's currency around the globe. This banking product, although high risk, is vital to the world's economy. By 1992, the bank's international logistics network had expanded to 50 countries. That same year, after the collapse of the Soviet Union, Republic National Bank, with the approval of the Federal Reserve, started to supply United States currency to Russian banks to enhance United States influence. Mr. Ofer was sent to Russia to create a logistics system to support the safe delivery of United States currency to three Russian cities, Moscow, Yekaterinburg, and Novosibirsk, and five former Soviet Union cities, Kiev, Almaty, Tallinn, Tbilisi, and Vilnius.

In 1995, Mr. Ofer was grateful to be granted United States citizenship.

Five years later, in 2000, HSBC purchased Republic National Bank. For the next ten years Mr. Ofer continued as logistics manager and grew HSBC's global network to over 70 countries. However, in 2010, HSBC laid off about 30,000 international banking employees, including Mr. Ofer. The following year he became a one-third partner in a consulting firm, GHI Group LLC, and oversaw and advised a bank that was the other partner's major client on the physical logistics of the business.

### B.  Letters of Support

The letters of support for Mr. Ofer attached hereto as Exhibit A are impactful and speak for themselves. His ex-wife, Anat Ofer, a Manhattan real estate broker, writes of Mr. Ofer that he

13

is "a devoted father" and "a man who has faced so much adversity in his life."[5] She writes of him

being "a dependable, dedicated father, and a dedicated son and brother-in-law to his sister-in-law

Yafit Ofer, who passed away from cancer in 2015, a year following our separation." His current

wife, Mi Hwa Mun, has found him to be a humble man who does not live an ostentatious life.[6]

Similar personal letters of love come from his two sons and his niece, Maayan Raz.[7]

Letters from close relatives are to be expected. Other letters come from friends and business

associates. Each speaks to Mr. Ofer's high moral qualities. They are before the Court to review

and support the conclusion that the conduct here was an outlier and that leniency is appropriate.

One letter in particular should be highlighted. It comes from the son of a woman whom

Mr. Ofer hired and supervised many years ago while at Republic National Bank.

> Hanan always treated my mother well and gave her opportunities that no one else
> would have ever given her. My family immigrated from Cuba in 1968, so when
> Hanan gave my mother an opportunity to work as an assistant to the transportation
> department, it was a big deal. My mother's English was average at best, but Hanan
> believed in her and she was able to flourish.[8]

The letter states further that "[b]ecause of Hanan's leadership, I was able to graduate college, and

become a Special Agent for the United States Drug Enforcement Administration. I am a retired

DEA agent and worked for the government for 22 years." What the author says about Mr. Ofer

speaks volumes:

> Hanan has expressed a deep regret in what he did and has continued to impress me
> as a role model by accepting responsibility for his misconduct and admitting that
> he made a mistake. The case before you only represents a very small part of Hanan's
> life …His involvement in this crime does not define who he is, and the many
> individuals who he affected, to include me and my family can attest that he deserves
> consideration by your Honor.[9]

---

[5] Letter from Anat Ofer, dated October 25, 2022.
[6] Letter from Mi Hwa Mun, dated October 30, 2022.
[7] Letter from Dean Ofer, dated November 12, 2022; letter of Dvir Daniel Ofer, dated November 13, 2022; letter from Maayan Raz, dated March 1, 2023.
[8] Letter from Manuel Recio, dated November 9, 2022.
[9] *Id.*  Mr. Recio's mother also wrote a letter in support of Mr. Ofer (Letter of Maria R. Recio, dated November 13, 2022).

14

Read together, the letter submissions lead to the inescapable conclusion that we respectfully request the Court draw here: Mr. Ofer's crime was an aberration from an otherwise long, well-led, and law-abiding life. A sentence of incarceration is not required to serve the ends of justice. The Court may be assured by the outpouring of respect and admiration for Mr. Ofer – who turns 70 years old in August – that this will be the last time he stands before a Court in this capacity.

## IV.    THE CHARGED CONDUCT AND APPLICABLE GUIDELINES

As described in the PSR and at his guilty plea allocution, Mr. Ofer has fully accepted responsibility. He is deeply remorseful and concerned that the consequences of his conviction will jeopardize his ability to be there for his family and extended family.

Mr. Ofer and the Government agree that, after receiving credit for acceptance of responsibility, the Total Offense Level is 6. As explained previously, Mr. Ofer was originally charged with one count of an eight-count indictment. And after the Government carefully considered the defense view of the facts and law regarding Mr. Ofer's role and conduct in this matter, the Government allowed him to plead guilty to a less serious crime that was more representative of his conduct. In addition to that significant change in the circumstances of the case, the Government further recognized that Mr. Ofer's role in that less serious offense was properly characterized as that of a minor participant, which resulted in a significant two-point reduction in his Total Offense Level.  As a result, the recommended Guidelines range for Mr. Ofer is zero to six months' imprisonment.[10]

---

[10] The defense does not contest the application of U.S.S.G. enhancement under Section 2S1.3(b)(2) for a pattern of unlawful activity under the circumstances of this case.

Mr. Ofer does not dispute the mathematical calculation or the applicable adjustments that resulted in his calculated Offense Level of 6.

## V.        A NON-INCARCERATORY SENTENCE IS WARRANTED

It is well settled that the Sentencing Guidelines are advisory. *United States v. Booker*, 543 U.S. 220 (2005). A district court can vary from a guideline range solely on policy considerations/disagreements with a guideline and is free to not apply the guidelines at all should the circumstances warrant a different sentence. *Kimbrough v. United States*, 552 U.S. 85, 101, 113 (2007).

Here, the Sentencing Guidelines would allow for a non-incarceratory sentence. This Court need not grant a downward departure or variance to impose such a sentence. The factors enumerated in 18 U.S.C. § 3553(a) do not require this Court to impose a jail sentence and, when considered, militate against such a sentence. The Court has wide latitude to ensure that the punishment "fit[s] the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 488 (2011). This Court should exercise that discretion here and not sentence Mr. Ofer to jail.

Applying 18 U.S.C. § 3553(a)'s sentencing factors, we respectfully submit that a non-incarceratory sentence is appropriate here based upon, among other reasons, Mr. Ofer's lack of a criminal history, his prior life's history, and the nature and circumstances of the offense.

### A.  The Personal History and Characteristics of the Defendant

The "history and characteristics of the defendant," a factor under 18 U.S.C. § 3553(a)(1), strongly support a non-incarceratory sentence. If the Court takes nothing else away from this memorandum, we hope it will recognize the extent to which this crime was an outlier, brought on by a failure to be more aggressive in maintaining an effective AML policy, a function that was the primary responsibility of others.  Mr. Ofer, himself, during the time of the offense, was focused primarily on the operations of the business that was related to his three-decade career – the physical

16

logistics of moving bulk currency. He was far less involved in the matters that related to the failure of the AML policy than he should have been.  We submit respectfully that the ends of justice will not be served by an incarceratory sentence in this case.

### B.  The Nature and Circumstances of the Offense

We have already described the nature and circumstances of the offense. This was not a crime of violence. The Government never charged anyone, much less Mr. Ofer, with actual acts of money laundering. This crime is about the failure to avoid the risks of money laundering. Mr. Ofer, himself, was not trying to promote money laundering or misuse the United States banking system for other nefarious financial activity. Mr. Ofer believed that the transactions involved were legitimate and represented legitimate transfers of funds intending to facilitate U.S. dollar transfers. Notably, too, although Mr. Ofer admits that he did not ensure that the AML program at hand was legally sufficient, he did not believe that the entities operated without any controls whatsoever. He was aware that due diligence was conducted regarding whether the banks and the U.S. money transmitter who were customers were themselves regulated and maintained AML procedures of their own. Significantly, the Government agrees that Mr. Ofer was a minor participant based on these facts.

### C.  Protection of the Public

18 U.S.C. § 3553(a)(2)(C) requires that, in determining a sentence, the Court should consider what will protect the public. Mr. Ofer poses absolutely no danger to the public. He, at nearly 70 years of age, is a first-time offender who did not fully appreciate the wrongfulness of his actions. He now does. He is remorseful. He does not wish to embarrass his family or his community further. There is no evidence that he presents a threat to the public at this point. A prison sentence for his minor role would only remove this now-retired, nearly 70-year-old man from his family.

### D.  Seriousness of the Offense and Deterrence

A non-incarceratory sentence would adequately reflect the seriousness of the offense and the need for deterrence, as required by 18 U.S.C. § 3553(a)(2)(A)-(B). This is true for several reasons.

First, this is a white-collar crime; it is not a violent or narcotics-related crime. The courts have recognized that non-incarceratory sentences can, and do, send a strong message to potential white-collar offenders. *See United States v. Tomko*, 562 F.3d 558, 573 (3d Cir. 2009) (declining to adopt the government's argument that a probation-only sentence in a complex securities fraud case would harm general deterrence).  The shame of this criminal conviction alone provides sufficient deterrence. Mr. Ofer has already experienced impact from his plea of guilty.

Second, a felony conviction is a sufficient punishment in its own right. *See United States v. Nesbeth*, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016) (urging sentencing courts to consider the collateral consequences facing a convicted felon). Due to his age and this felony conviction, Mr. Ofer will not be in a position to return to the banking activities that made up most of his adult life. He is effectively retired from the banking industry. Incarceration is not required under the Guidelines for this first-time offender, and it is not required to promote the ends of justice.

Third, as noted, Mr. Ofer did not launder money and notably did not profit extravagantly from the offense in executing the business. His crime was that of creating an unnecessary risk that a serious offense might occur – which is a crime in and of itself for which he bears responsibility, but not the same type of crime as that which would be present if the risks were in fact realized. His remorse need not be reinforced by a term in jail.

18

Finally, Mr. Ofer was not the prime mover of the offense in this matter. He was, by all accounts – and as agreed to by the Government – a minor participant, who has now fully acknowledged and accepted responsibility.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

We note the Government's emphasis in the indictment that Mr. Ofer and Mr. Asre worked at HSBC, an entity that entered into a $1.92 billion settlement with the Government as a result of failings in its AML program. Obviously, the AML failings at HSBC were significant, widespread throughout the organization, and exposed the U.S. financial system to risk. No one individual or even one line of business was directly responsible for HSBC's failings – and certainly not Mr. Ofer. Indeed, to our knowledge, no individuals were charged with a crime related to those compliance failings. Again, this is not to say that Mr. Ofer's failures at the CUSO should have been excused, or that they are not serious, but it is notable that individuals and entities that exposed the U.S. financial system to far greater risks escaped criminal prosecution altogether.

### F.  The Court Should Consider Alternatives to Incarceration

In 2009, the Sentencing Commission issued a report on alternative sentencing that recognized that "[e]ffective alternative sanctions are important options for federal, state, and local criminal justice systems. For the appropriate offenders, alternatives to incarceration can provide a substitute for costly incarceration." The 2014 ABA Shadow Guidelines for Economic Offenses concluded that "a sentence other than imprisonment is generally appropriate" for defendants charged with non-serious economic offenses that have no criminal history.

In October 2014, Judge Gleeson cited then-Deputy Attorney General Sally Yates' comment that "[w]hile it's true that there are dangerous defendants from whom society needs to be protected, there are others . . . for whom alternatives to incarceration make a lot more sense."

19

*United States v. Dokmeci*, No. 13-CR-00455 (JG), 2016 WL 915185, at *10 (E.D.N.Y. Mar. 9, 2016). Courts too have recognized the need to consider alternative sentences. *United States v. Murphy*, 108 F.R.D. 437, 439 (E.D.N.Y. 1985) (Judge Weinstein reasoning that "[f]or most crimes of white-collar corruption it may not be necessary to provide substantial prison terms."); *United States v. Pippin*, 903 F.2d 1478, 1484 (11th Cir. 1990) (noting that, after "extensive study," the Sentencing Commission recommend leeway for the sentencing judges to impose non-custodial sentences in white collar cases with low Guidelines ranges).

**G. Fine**

In the plea agreement, the Government did not seek that Mr. Ofer pay a fine. Nor was restitution or forfeiture sought. As stated above, Mr. Ofer was a minor participant in the crime to which he has pled guilty. And his compensation was modest. He does have significant assets, but he also has significant liabilities. USSG §5E1.2(d)(2). We believe that no fine should be ordered in this matter.

Further, even were a fine appropriate, we believe that fine should be no more than what is appropriate under the proper guideline range as calculated by the Government and by the defense, that is, a sentencing guideline level of 6. For that guideline range, the sentencing guidelines provide that a monetary fine should be between $1,000 and $9,500. USSG §5E1.2(c)(3).

As indicated above, this is Mr. Ofer's first encounter with the criminal justice system and he has shown respect for the law throughout his life. USSG §5E1.2(d)(1); (d)(6). We believe that collateral consequences of a conviction are sufficiently punitive in this matter such as not to require a fine. USSG §5E1.2(d)(5); (d)(8).

## VI.     CONCLUSION

We respectfully ask this Court to consider all of the facts regarding Mr. Ofer's background, nature, and character in imposing sentence. He is extremely ashamed and remorseful about the conduct for which he stands convicted, and since his arrest he has worked to try to move past this episode in his life. The business at issue in the indictment was not lucrative, and Mr. Ofer received relatively little compensation as a result of his participation.

For all of the foregoing reasons, Mr. Ofer most respectfully requests that this Court impose a non-incarceratory sentence and consider alternatives to incarceration.

Respectfully submitted,

/s/Arthur D. Middlemiss
Arthur D. Middlemiss
Lewis Baach Kaufmann Middlemiss pllc
405 Lexington Avenue
64th Floor
New York, New York 10174
(212) 826-7001
*Counsel for Hanan Ofer*